**THE KICK LAW FIRM, APC**
Taras Kick (State Bar No. 143379)
(Taras@kicklawfirm.com)
Roy K. Suh (State Bar No. 283988)
(Roy@kicklawfirm.com)
Daniel J. Bass (State Bar No. 287466)
(Daniel@kicklawfirm.com)
815 Moraga Drive
Los Angeles, California 90049
Telephone:   (310) 395-2988
Facsimile:   (310) 395-2088

Jeffrey D. Kaliel, CA Bar No. 238293
(jkaliel@kalielpllc.com)
Sophia G. Gold, CA Bar No.  307971
(Sgold@kalielpllc.com)
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
Telephone: (202) 350-4783

Attorneys for Plaintiffs Roxanne Wicks,
Claudine Saldivar, Barbara Bustamante, and
all others similarly situated

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROXANNE WICKS, CLAUDINE SALDIVAR, AND BARBARA BUSTAMANTE, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PATELCO CREDIT UNION, and DOES 1 through 100, inclusive,<br><br>Defendants. | **CASE NO.: 4:20-CV-04586-HSG**<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR**<br><br>(1) Breach of Contract;<br>(2) Breach of the Implied Covenant of Good Faith and Fair Dealing;<br>(3) Unjust Enrichment/Restitution;<br>(4) Money Had and Received; and,<br>(5) Violation of the Unfair Competition Laws, Bus.& Prof. Code §17200, *et seq*.<br><br>**DEMAND FOR JURY TRIAL** |

AMENDED CLASS ACTION COMPLAINT

Plaintiffs Roxanne Wicks, Claudine Saldivar and Barbara Bustamante ("Plaintiffs"), by and through their attorneys, hereby bring this class and representative action against Patelco Credit Union and DOES 1 through 100 (collectively "PATELCO" or "Defendant").

**NATURE OF THE ACTION**

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiffs or their counsel.  Allegations pertaining to Plaintiffs or their counsel are based upon, *inter alia*, Plaintiffs' or their counsel's personal knowledge, as well as Plaintiffs' or their counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiffs to assert claims in their own right, and in their capacity as the class representatives of all other persons similarly situated, and in their capacity as a private attorney general on behalf of the members of the general public.

3.      On behalf of themselves and all members of the putative class, Plaintiffs opt-out of and reject and decline the attempted binding arbitration clause in the Patelco Account Agreement dated May 1, 2020.

4.      PATELCO wrongfully charged Plaintiffs and the Class Members fees related to their checking accounts.

5.      This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, PATELCO's policy and practice to maximize the fees it imposes on members.  The conduct has the common denominator of breaching its members' contracts and violating laws so as to maximize PATELCO's fee income.  This conduct includes but is not limited to, assessing an overdraft fee on transactions when by Defendant's own calculations there was enough available money in the checking account to cover the transaction at issue when authorized and the money was specifically held for that transaction but would be assessed an overdraft fee anyway; and imposing more than one NSF fee, or an NSF fee followed by overdraft fee, on the *same* electronic

item or check. The charging of such fees breaches PATELCO's contracts with its members, who include Plaintiffs and the members of the Class.

**PARTIES**

6.     Plaintiff Barbara Bustamante is a resident of Alameda County, California. Plaintiff Roxanne Wicks is a resident of Solano County, California.  Plaintiff Claudine Saldivar is a resident of Santa Clara County, California. They all had a checking account with PATELCO at all times relevant to the class action allegations.

7.     Based on information and belief, Defendant PATELCO is and has been a credit union with its headquarters located in Dublin, California.  PATELCO has assets of more than $7 billion, and over 360,000 members.

8.     Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of PATELCO and, upon information and belief, also own and/or operate PATELCO branch locations.   As used herein, where appropriate, the term "PATELCO" is also inclusive of Defendants DOES 1 through 100.

9.     Plaintiffs are unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

10.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

11.     At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the

acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

12.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

13.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

**VENUE AND JURISDICTION**

14.     This Court is proper to hear this matter, among other reasons, because the events at issued occurred within this Court's jurisdiction and venue, and because Defendant's principal place of business is in Dublin, California.

**FACTUAL ALLEGATIONS**

15.     PATELCO offers its consumer banking customers a checking account.  One of the features of an PATELCO checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of an PATELCO checking account include the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

16.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), PATELCO has charged what it calls "Debit Card Paid NSF Fee;" "ACH Returned Item" "NSF Fee;" "Paid NSF Fee;" "NSF Bill Pay Fee;" "NSF POS Fee;" "Check Card NSF Fee;" "Recurring PD NSF Fee;" "NSF Fee ACH Debit;" and, "Retry Debit Fee."  As alleged further below, these fees either were not at all permitted to be charged by any PATELCO Account Agreement or contract in existence during the class periods, or were charged in breach of the contracts, or were charged without required predicate compliance with law.

17.     Overdraft fees and Nonsufficient Funds fees ("NSF fees") constitute the primary fee generators for banks and credit unions.  According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as PATELCO, overdraft fees and NSF fees are a major source of revenue and a profit center.

18.     Since 2000, the average dollar amount of a checking account transaction has become much lower because customers, and especially younger customers, use debit cards instead of cash or credit cards for everyday purchases.   In 2016, the number of terminals that accept debit cards in the United States had increased by approximately 1.4 million compared to 2011.[1]   That has translated to the average dollar amount of overdraft transactions being lower than in 2000.  However, while the average overdraft transaction is substantially lower and provides much less risk and exposure to the bank, the average cost of overdraft fees per transaction has gone up.

19.     The high cost of an overdraft fee is also usually punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake. (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.   (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

---

[1] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016,     http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23 (last visited March 7, 2019).

AMENDED CLASS ACTION COMPLAINT

20.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id*. at p. 3).

21.    As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The rulings of these cases have predominantly fallen in favor of consumers, forcing the banks and credit unions to repay their customers significant amounts of wrongfully collected overdraft fees.

22.    An accounting gimmick related to increasing overdraft and NSF fees used by some financial institutions, which on information and belief financial institutions such as Defendant may use, is an "approve positive – post negative" ("APPN") method of calculation. It works as follows. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, PATELCO immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount.  As a result, customers' accounts will always have sufficient available funds available to cover these transactions.

23.    However, PATELCO still assesses $28 overdraft fees on many of these transactions and mispresents its practices in its account documents. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, PATELCO later assesses overdraft fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPN Transactions.

24.    PATELCO maintains a running account balance in real time, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to

account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, PATELCO subtracts the dollar amount of the transaction from the customer's available balance and places such funds on a hold. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

25. That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. Accordingly, many subsequent transactions incur overdraft fees due to the unavailability of the funds sequestered for those debit card transactions.

26. Still, despite keeping those held funds off-limits for other transactions, PATELCO improperly charges overdraft fees on those APPN Transactions, although the APPN Transactions *always* have sufficient available funds to be covered.

27. The Consumer Financial Protection Bureau in its Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights" has expressed concern with this very issue, calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead,

and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive.  Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

28.     There is no justification for these practices, other than to maximize PATELCO's overdraft fee revenue.  APPN transactions only exist because intervening checking account transactions supposedly reduce an account balance.  PATELCO is free to protect its interests and either reject those intervening transactions or charge overdraft fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.  But PATELCO was not content with these millions in overdraft fees. Instead, it sought millions *more* in overdraft fees on these APPN Transactions.

29.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in PATELCO's  adhesion contracts—contracts which fundamentally misconstrue and mislead consumers about the true nature of PATELCO's  processes and practices. These practices also exploit contractual discretion to gouge consumers. In short, PATELCO is not authorized by contract to charge overdraft fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**Mechanics of a Debit Card Transaction**

30.     A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from PATELCO.   When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to PATELCO, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

31.     At this step, if the transaction is approved, PATELCO immediately reduces the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

32.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations: "When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions." Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 25, 2009).

33.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.  PATELCO decides whether to "pay" debit card transactions at authorization.  If it decides to pay, after that, PATELCO is obligated to pay the transaction no matter what.  For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when PATELCO may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the credit union has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. Notably, there is no change—***no impact whatsoever***—to the available funds in an account when this step occurs.

**PATELCO's  Account Contract**

34.     Plaintiffs had a PATELCO checking account, which during the class period was covered by the Account Agreements in effect prior to the Account Agreement dated May 1, 2020. The Account Agreement and relevant contract documents covering overdraft fees provide that PATELCO will not charge overdraft fees on transactions that have sufficient funds to cover them at the time they are initiated.

35.    For debit card transactions, this moment occurs at the moment of authorization. For APPN transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet PATELCO assesses overdraft fees on them anyway.

36.    The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance.  Of course, that is not true for APPN transactions.   In fact, PATELCO actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions.  Instead, it uses the secret posting process described below.

37.    PATELCO charges overdraft fees even when sufficient funds exist to cover transactions that are "authorized and paid" into a positive balance.  No express language in any document states that PATELCO may impose overdraft fees on any APPN Transactions.

38.    The account documents misconstrue PATELCO's  true debit card processing and overdraft practices.  First, and most fundamentally, PATELCO charges overdraft fees on debit card transactions for which there are sufficient funds available to use to cover the transactions.

39.    PATELCO assesses overdraft fees on APPN Transactions that **do** have sufficient funds available to cover them throughout their lifecycle. PATELCO's  practice of charging overdraft fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so.  This discrepancy between PATELCO's  actual practice and the contract causes consumers like Ms. Saldivar to incur more overdraft fees than they should.

40.    Sufficient funds for APPN Transactions are actually debited from the account immediately, consistent with standard industry practice. These withdrawals take place upon initiation and thus they cannot be re-debited later. But that is what PATELCO does when it re-debits the account during a secret batching posting process.

41.    In reality, PATELCO's actual practice is to attempt the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.   At the time of settlement, however, an available

balance *does not change at all* for these transactions previously authorized into good funds. As such, PATELCO cannot then charge an OD fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

42.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, PATELCO does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, PATELCO releases the hold placed on funds for the transaction for a split second, putting money back into the account, and then re-debits the same transaction a second time.

43.     This secret step allows it to charge overdraft fees on transactions that never should have been subject to them—transactions that were authorized into sufficient funds, and for which PATELCO specifically set aside money to pay them.   This discrepancy between PATELCO's actual practices and the contract causes accountholders to incur more overdraft fees than they should. In sum, there is a huge gap between PATELCO's  practices as described in the account documents and PATELCO's  practices in reality.

44.     The assessment of overdraft fees on APPN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPN Transactions).   If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

45.     PATELCO was and is aware that this is precisely how its members reasonably understand debit card transactions to work.  PATELCO knows that many consumers prefer debit cards for these very reasons.  Consumer research indicates that consumers prefer debit cards as a budgeting device because they do not allow debt like credit cards do.

46.     On information and belief, although access to Defendant's database will be sought by Plaintiffs to confirm, Plaintiff Saldivar was charged such inappropriate APPN fees at least on the following occasions. On July 3, 2018, Plaintiff Saldivar made a debit card purchase for $1.85

for which sufficient available funds were held and set aside on July 3, 2018, while her balance was positive even after the sequestered $1.85, but when the transaction posted on July 5, 2018, PATELCO imposed a $28.00 fee, thereby turning a $1.85 purchase into a $29.85 cost. As another example, on June 23, 2018, Plaintiff Saldivar made a debit card purchase for $23.56 while her available balance was positive even after the $23.56 was placed on hold, but when the transaction posted on June 25, 2020, PATELCO imposed what a $28.00, thereby turning a $23.56 purchase into a $51.56 cost. With regard to Plaintiff Wicks, although access to Defendant's database will be sought by Plaintiff to confirm, Plaintiff was charged such inappropriate APPN fees at least on January 23, 2018, when Plaintiff made a debit card purchase for $6.89 for which funds were held and set aside on January 23, 2018, while her balance was positive even after the sequestered $6.89, but when the transaction posted on January 25, 2018, PATELCO imposed a $28.00 fee, thereby turning a $6.89 purchase into a $34.89 cost. As another example, Plaintiff made a debit card purchase on March 25, 2018, for $57.00 for which sufficient available funds were held and set aside on March 25, 2018, while her balance was positive even after the sequestered $57.00, but when the transaction posted on March 26, 2018, PATELCO imposed a $28.00 fee, thereby turning a $57.00 purchase into an $85.00 cost. As another example, Plaintiff made a debit card purchase on September 29, 2018, for $16.20 for which funds were held and set aside on September 29, 2018, while her balance was positive even after the sequestered $16.20, but when the transaction posted on October 1, 2018, PATELCO imposed a $28.00 fee, thereby turning a $16.20 purchase into an $44.20 cost. On information and belief, a review of Defendant's records to be produced in discover in this matter will reveal numerous other incidents of this improper practice.

47. PATELCO had no authority to use an APPN calculation to assess overdraft and NSF fees in its contract with its customers during the class period, and such practices breach its contracts with its customers and are also deceptive, unfair, and unconscionable. These practices exploit any contractual discretion PATELCO may have in its contracts with its customers in an unreasonable way that adds to PATELCO's profits and harms its customers. PATELCO does not

describe this APPN procedure in its contracts. Instead, it states almost the opposite of this on page 5 of the operative Account Agreement as follows:

> Your "current balance" is the amount of money in your account at the beginning of a business day. This amount does not include any pending deposits or withdrawals. Your "available balance" is your current balance **minus any pending Debit Card purchases**, automatic drafts, processing checks or other debits from your account. Available balance is the actual amount available to you to make withdrawals or make payments. We determine whether your account has a positive balance is overdrawn, and **we calculate all fees associated with overdrafts, based on available balance**. (emphasis added)

48. Further on page 13 of the same Account Agreement, PATELCO also expressly informs account holders that "authorization holds" are immediately placed on debit card transactions, and that such holds "will not be available for any other use:"

### • Effect of Use on Available Checking Account Balance

Your Checking Account will usually be debited within three business days after the date you use the Debit Card for a purchase or cash withdrawal. However, the amount of such transactions will be held from available funds from the date of the transaction until the end of the hold period, and will not be available for any other use.

49. Of course, when PATELCO then authorizes debit card transactions on positive available funds and places an "authorization hold" for the amount of the transaction, not allowing it to be used for anything else, it then violates these Account Contract terms when it later charges OD Fees on such debit card transactions.

50. On page 19 of that Account Agreement, PATELCO further reinforces this by stating that an overdraft occurs "when there is not enough money to cover a transaction", but in practice PATELCO sequesters enough money to cover the transaction but charges an overdraft fee anyway when the transaction later posts:

## WHAT YOU NEED TO KNOW ABOUT OVERDRAFTS AND OVERDRAFT FEES

An overdraft occurs when you do not have enough money in your account to cover a transaction but we pay it anyway. We can cover your overdrafts in two ways:

51. Only when an Account Agreement dated May 1, 2020, became effective did PATELCO for the first time actually contract with its members to charge overdraft fees and NSF

fees as it had been doing. Specifically, in the Account Agreement dated May 1, 2020, PATELCO drastically rewrote its contractual term on how it would charge overdraft fees to now match the practice in which it previously had been wrongfully engaging and breaching its prior contracts with its members. The new Account Agreement dated May 1, 2020, for the first time now states, on pages 11-12, as follows:

> For Debit Card Transactions, we use your available balance at the time a transaction posts to determine when your account is overdrawn and whether fees will be assessed. For Debit Card transactions involving merchant authorization holds (see the Authorization Holds for Debit Card Transactions section of this handbook), because there may be a longer delay between an authorization hold being applied and the transaction posting, **this can sometimes result in a Debit Card Paid NSF Fee based on an insufficient available balance at the time of a transaction posting, even if the available balance was sufficient earlier at the time of the authorization hold being applied.**

> It is important to keep in mind that for Debit Card transactions, we check your available balance at two separate times – first, at the time a merchant authorization request is received, and second, when the transaction "settles" and posts to your account. If your available balance is insufficient to pay the pre- authorization amount requested by a merchant, we will decline the request. If your available balance is sufficient to cover a merchant's authorization request, the authorization request will be approved and an authorization hold will be placed on your account in the amount of the merchant's authorization request. If the transaction later "settles" and posts to your account at a time when the available balance is insufficient to pay the posted transaction without causing an overdraft (i.e., paying the posted transaction results in an available balance of less than $0), **we will charge a Debit Card Paid NSF Fee on that transaction even though the available balance was sufficient to cover it at the time the transaction was authorized.**

> The following example illustrates how this works:

> Assume your current and available balance are both $40, and you use your Debit Card at a restaurant for $30. If the restaurant requests preauthorization in the amount of $30, an authorization hold is placed on $30 in your account, so your available balance is only $10. Your current balance would remain $40. Before the restaurant charge is sent to us for payment, a check that you wrote for $40 clears. Because your available balance is only $10 (due to the authorization hold of $30), your account will be overdrawn by $30, even though your current balance is $40. In this case, if we pay the $40 check under our Discretionary Overdraft Services, we will charge you a Paid NSF Fee of $28, which will be deducted from your account, further increasing the overdrawn amount. In addition, when the restaurant charge is finally submitted to us for payment, we will release the authorization hold and pay the transaction amount (which may be $30 or even a different amount, for example, if you added a tip) to the restaurant. Because the amount of the restaurant charge exceeded your available balance at the time the restaurant charge "settled" (i.e., posted to your account), we will charge you a Debit Card Paid NSF Fee of

$28, even though the restaurant transaction was authorized and approved with a sufficient available balance.

(emphasis added).

52.     As such, Plaintiffs end the class period for the APPN damages at issue in this complaint the day before the Account Agreement dated May 1, 2020 actually became effective since this new contract now allowed PATELCO to charge overdraft fees using the APPN gimmick it previously had been using without authority.

53.     This APPN gimmick also breached a second PATELCO contract, the Regulation E required contract, the Opt-In Contract.  It states, "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  When PATELCO therefore engages in the APPN gimmick it is breaching this term since it literally has set-aside the money to pay for the transaction at issue when there was "enough money in [the] account to cover [the] transaction," but then may charge an overdraft fee on that transaction regardless.

54.     PATELCO also violates the Opt-In Contract provision which states:  "Even if you do not request overdraft coverage for signature-based debit card purchases, we may still pay your overdrafts for other types of transactions, including checks and electronic transfer (ACH). **If we do not authorize and pay an overdraf**t, your transaction will be declined."  (emphasis added)  The "authorize and pay" promise means that authorization and payment are coterminous, and overdrafts are determined at the time of authorization.

55.     PATELCO also has an improper practice of charging multiple NSF fees, or an NSF fee followed by an overdraft fee, for the same electronic item.  PATELCO charges a $28 fee when an electronic item is first processed for payment and PATELCO determines that, in its opinion, there is not enough money in the account to cover the item.  PATELCO then charges an *additional* NSF fee, or an overdraft fee following the NSF fee, if the same item is presented for processing again, even though the account holder took no action to resubmit the transaction.

56.     This charging of more than one fee for the same item breaches PATELCO's Account Agreement.   The Account Agreement states at page 9:

> e. Whether we pay the overdrafting **item** or return/decline it, we may assess either the Paid NSF **fee** (but in the case of payments) **or** the returned NSF **fee**, as applicable. (emphasis added)

57. As can be seen, PATELCO uses the singular "fee" not the plural "fees." Further, it does not state "per each presentment of an item" but rather states per "item." PATELCO also does not state that it ever will charge both "an NSF fee **and** an overdraft fee," for an item, but rather states it will be "or."

58. A second presentment or "re-presentment" or a "retry" of an "item" does not change it into a new or different "item." It is still the same "item" being presented by the same merchant in the same dollar amount, not a new "item." A check or electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique additional "item" for fee assessment purposes. Nowhere did the Account Agreement or Fee Schedule effective during the class periods state that PATELCO may charge multiple overdraft or NSF fees per item.

59. PATELCO dramatically changed its Account Agreement on this issue of charging more than one NSF for the same "item" with its Account Agreement dated May 1, 2020, when it now contracted for the first time that it would charge an NSF Fee each time the same "item" was "presented" or "re-presented," when it contracted for the first time ever on page 17 as follows:

> If your account does not have sufficient available funds when a transaction or item is presented to us for payment and, as a result, returned unpaid, the merchant or payee of your transaction or item may choose to resubmit the same transaction, and may do so multiple times; this may also occur when you initiate transfers and payments through your Credit Union online banking or Bill Pay services and your account lacks sufficient available funds at the time the transaction is scheduled to occur, as we may decline the transaction, charge a NSF Fee, and then resubmit the same transaction at a later time in an attempt to process your requested transaction. **In the event a transaction or item is resubmitted for payment at a time when your account lacks sufficient available funds to pay it and we decline it, we will charge a related NSF Fee for each such resubmitted item each time that same transaction is returned unpaid or a Paid NSF Fee if a resubmitted item is paid when your account lacks sufficient available funds to pay it**. (emphasis added.)

60. At all times during the relevant class period in this lawsuit, PATELCO's had no such Account Agreement language.

61. Further, its Account Agreement language on this issue at all times during the class period also specifically referred its members to the Fee Schedule, as follows, on page 9:

> 3. If we return a check unpaid, we will charge a "NSF" (non-sufficient fund) fee for any checks presented for payment to the payee's financial institution. See the Fee Schedule for charges on NSF checks.

AMENDED CLASS ACTION COMPLAINT

62. The Fee Schedule to which the Account Agreement directs members to look for what will be charged for NSF Fees at all times during the class period stated as follows:

## Non-Sufficient Funds (NSF) Charges

| | |
|---|---|
| ACH Returned Item | $28.00 |
| NSF Fee | $28.00 |
| Paid NSF Fee | $28.00 |
| NSF Bill Pay Fee | $28.00 |
| NSF POS Fee | $28.00 |

63. Only as of March 1, 2019, did PATELCO change its Fee Schedule to indicate it

64. Throughout the class period, Patelco thereby represented a single NSF Fee per item. Only when it amended its Fee Schedule on March 1, 2019 did Patelco first state that it would charge such fees "per presentment", every time the item was presented:

## Non-Sufficient Funds (NSF) Charges per Presentment

| | |
|---|---|
| ACH Returned Item | $28.00 |
| NSF Fee | $28.00 |
| Paid NSF Fee | $28.00 |
| NSF Bill Pay Fee | $28.00 |
| NSF POS Fee | $28.00 |

65. Prior to that change in both the Fee Schedule and the Account Agreement, contract, PATELCO had not contracted to charge the fee "per presentment" or "per retry of the item." A "re-presentment" or a "retry" of an "item" does not change it into a new or different "item." It is still the same "item" being presented by the same merchant in the same dollar amount, not a new "item." An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique additional "item" for fee assessment purposes. Only when its Fee Schedule and Account

Agreement changing the terms of the contract to each presentment of the item did PATELCO arguably contract to charge an NSF Fee for the same item every time it was presented.

66. Of note, many financial institutions that do engage in this same or similar abusive practice of charging repeat NSF fees for the same "item" at least at a minimum make this clear in their Account Agreements, Fee Schedules, or Opt-Ins, unlike Defendant. They typically use terminology such as "per presentment" or "per each presentment" to make this clear, and often also add far more in explaining this to be sure it not ambiguous, the way PATELCO did for the first time in its May 1, 2020, Account Agreement or February 1, 2019, Fee Schedule. The following are some examples from other banks and credit unions that make clear what PATELCO was contractually required to do, if it was going to engage in charging multiple $25 NSF fees, or overdraft fees following an NSF fee, for the same item.

67. Air Academy Federal Credit Union contracts for its NSF fee as follows:

"$25.00 **per presentment**."

*See,* https://www.Patelco.com/fees.html (emphasis added) [last visited on or about March 17, 2020].

68. Central Pacific Bank contracts unambiguously:

Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $25 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

*See,* https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf (emphasis added) [last visited on or about March 17, 2020].

69. Community Bank, N.A. unambiguously contracts:

**You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned**.

*See,* https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure-FINAL-1.14.2020.pdf (emphasis added) [last visited on or about March 17, 2020].

70. Delta Community Credit Union contracts unambiguously as follows:

"$30 **per presentment**."

*See,* https://www.deltacommunitycu.com/home/fees.aspx (emphasis added) [last visited on or about March 17, 2020]. Further, in its Account Contract, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account. **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

*See,* https://www.deltacommunitycu.com/home/forms/member-savings-services-disclosures-and-agreements.aspx (emphasis added) [last visited on or about March 17, 2020].

71. First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **Each presentment is considered an item and will be charged accordingly**."

*See,* https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (emphasis added) [last visited on or about March 17, 2020].

72. First Hawaiian Bank unambiguously contracts:

> You agree that multiple attempts may be made to submit a returned item for payment and that multiple fees may be charged to you as a result of a returned item and resubmission.

*See,* https://www.fhb.com/en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_RXP1.pdf (emphasis added) [last visited on or about March 17, 2020].

73. First Northern Credit Union unambiguously contracts its NSF fee as,

"$22.00 **per each presentment and any subsequent representment(s)**."

*See,* https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-click_count (emphasis added) [last visited on or about March 17, 2020.

Further, in its Account Contract, First Northern unambiguously contracts as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**. For example, if you wrote a check to a merchant who submitted the payment to us and we returned the

AMENDED CLASS ACTION COMPLAINT

item (resulting in a NSF fee), the merchant may re-present the check for payment again. If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item. You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**

*See,*

(https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1_2019.pdf

(emphasis added) [last visited on or about March 17, 2020].

74. Glendale Federal Credit Union unambiguously contracts its NSF fee as,

"$30 **per presentment**."

*See,* https://glendalefcu.org/pdf/fees.pdf (emphasis added) [last visited on or about March 17, 2020].

75. Klein Bank contracts unambiguously:

[W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee** as provided in this section **regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*See,* https://kleinbankonline.com/bridge/disclosures/ib/disclose.html (emphasis added) [last visited on or about March 17, 2020].

76. Liberty Financial contracts its NSF fee unambiguously as:

"$27.00 **per presentment**."

*See,* https://liberty.financial/about/fee-schedule/ (emphasis added) [last visited on or about March 17, 2020].

77. Los Angeles Federal Credit Union contracts its NSF fee unambiguously as:

"$29 **per presentment**."

AMENDED CLASS ACTION COMPLAINT

*See,* https://www.lafcu.org/pdf/currentfees_bus.pdf (emphasis added) [last visited on or about March 17, 2020].

78.     Members First Credit Union contracts unambiguously:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** [.]

*See,*

http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf

(emphasis added) [last visited on or about March 17, 2020].

79.     Meriwest Credit Union unambiguously contracts its fee as:

"$35.00/item **per presentment**".

https://www.meriwest.com/sites/www.meriwest.com/files/media/consumer_feesched.pdf

(emphasis added) [last visited on or about March 17, 2020].

80.     Partners 1st Federal Credit Union contracts unambiguously:

Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*See,*     https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf

(emphasis added) [last visited on or about March 17, 2020].

81.     RBC Bank unambiguously contracts:

"We may also charge against the Account an NSF fee for each item returned or rejected, **including for multiple returns or rejections of the same item**."

*See,*     https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf (emphasis added) [last visited on or about March 17, 2020].

82.     Regions Bank contracts unambiguously:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our

charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

*See,* https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf (emphasis added) [last visited on or about March 17, 2020].

83.     Tyndall Federal Credit Union lists its NSF fee as:

"$28.00 **per presentment** (maximum 5 per day)."

*See,* https://tyndall.org/member_center/document_center/fee_schedule (emphasis added) [last visited on or about March 17, 2020].

84.     USE Credit Union contracts unambiguously:
"**Fees are charged per presentment, meaning the same item is subject to multiple fees if presented for payment multiple times**."

*See,* https://www.usecu.org/home/Files/static/documents/Schedule_of_Fees.pdf (emphasis added) [last visited on or about March 17, 2020].

85.     Therefore, if PATELCO wanted to engage in this abusive practice, it was at least required to state and contract so, as these other financial institutions all do. All these quotations show that the financial institutions differentiate between an "item" and a "presentment" of an item when calculating NSF or overdraft fees.  PATELCO did not use the term "per presentment" in its contract, but in practice PATELCO charged the fee "per presentment" not "per item" as it contracted.  Only on May 1, 2020 did PATELCO contend it changed its Account Agreement contract and on March 1, 2019, its Fee Schedule with its members to arguably allow an NSF fee "per presentment."  The fact that PATELCO made these changes shows that it too differentiates between a charge "per item" and a charge "per presentment."

86.     Plaintiffs were harmed by Defendant's policy and practice of charging multiple fees on the same item.  It will be necessary to obtain Defendant's records to determine each instance of such wrongful overdraft or NSF fees, but PATELCO breached its contracts with Plaintiff by charging multiple NSF fees on the same item, and by charging an overdraft fee following an NSF fee, at least on the following occasion.  On information and belief, Plaintiff

AMENDED CLASS ACTION COMPLAINT

Saldivar was charged a $28 NSF fee on July 26, 2018, and then was charged an additional $28 NSF fee on July 31, 2018, for this same item when this same item was presented again. PATELCO therefore charged Plaintiff two $28 NSF fees for the same item. On information and belief, Plaintiff Bustamante was charged a $28 NSF Fee on December 3, 2017, and then was charged an additional $28 NSF fee on December 7, 2017, for this same item when this same item was presented again. PATELCO therefore charged Plaintiff two $28 NSF fees for the same item. On information and belief, the above are just a few examples, and Plaintiffs believe that upon discovery Defendant's database will reveal numerous other and different examples of the improper charging of such fees.

87.     PATELCO's practice of charging multiple NSF fees, or an overdraft fee following an NSF fee, for a single item is particularly egregious because, as described, PATELCO assesses such fees using an improper APPN calculation which leads to overdraft fees that should not be assessed at all. These improper fees lead to a further lowering of the balance and, under PATELCO's policy of charging multiple NSF or overdraft fees on the same item, to additional improper fees compounded upon the first improper fee.

88.     In conjunction with its improper use of the APPN calculation, this resulted in fees which should not have been charged Plaintiff and class members. Discovery of PATELCO's databases will be required to confirm this.

89.     Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts. Plaintiffs did not and could not have, exercising reasonable diligence, discovered both that they had been injured and the actual cause of that injury until they met with their attorneys in or about 2020. While Plaintiffs understood that they were assessed fees, they did not understand the cause of those fees until then, because Defendant hid its actual practice from its members by describing a different practice in its contracts. It also mis-labeled fees and made it next to impossible for a reasonable person to understand which fees applied to which transactions or were authorized. This not only reasonably delayed discovery, but Defendant's affirmative representations and

actions also equitably toll any statute of limitations, and also additionally equitably estop Defendant.

90.     Plaintiffs and the class members were harmed by these practices when they were assessed such fees when they should not have been.  A complete evaluation of PATELCO's records is necessary to determine the full extent of Plaintiffs' harms from these practices.

### CLASS ACTION ALLEGATIONS

91.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

92.     Plaintiff brings this case, and each of her respective causes of action, as a class action on behalf of the following classes:

**Class One:  The APPN Class**

**All California residents who have or have had accounts with PATELCO who incurred an overdraft fee on a transaction that was authorized into a positive available balance beginning four years preceding the filing of this Complaint and ending on the day the Account Agreement dated May 1, 2020 became effective.**

**Class Two:  The Repeat NSF Class**

**All California residents who have or have had accounts with PATELCO who incurred an NSF fee more than once for the same item, or an overdraft fee following an NSF fee for the same item, during the period beginning four  years preceding the filing of this Complaint and ending one day before the effective date of the March 1, 2019, New Fee Schedule.**

93.     Excluded from the Classes are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class Members.

94.     This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to California Code of Civil Procedure section 382.

95. **Numerosity** – The members of the Class are so numerous that a joinder of all members would be impracticable. While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Classes are likely to include thousands of members based on the fact that PATELCO has approximately $7 billion in assets and 360,000 members.

96. Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of PATELCO 's members have been harmed by its practices and thus qualify as Class Members. Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover. Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

97. **Commonality** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

1. Whether, pursuant to the Account Agreements prior to the one dated May 1, 2020, Defendant contracted that it would charge more than one NSF fee for the same item, each time that same item was presented or re-presented;

2. Whether, pursuant to the Fee Schedules prior to the one dated March 1, 2019, Defendant contracted it would charge more than one NSF for the same item, charging an NSF each time the same item was re-presented;

3. Whether pursuant to the Account Agreements prior to the one dated May 1, 2020, Defendant contracted to charge an overdraft fee for transactions for which it had held sufficient funds while the balance was positive;

4. Whether the Account Agreements prior to the one dated May 1, 2020, were ambiguous as to whether Defendant could charge an overdraft fee for transactions for which it held sufficient funds when the available balance was positive;

5. Whether the Account Agreement contracted for Defendant to charge an overdraft fee based on an APPN calculation;

6. Whether the Opt-In Contracted was ambiguous on whether PATELCO would use an APPN calculation for assessing overdraft fees;

7. Whether the contracts are ambiguous on what fees will be charged under what circumstances, or referred to inconsistently

98. **Typicality** – Plaintiffs' claims are typical of all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiffs and all of the Class Members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Account Agreement and Fee Schedules, were identical as to all relevant terms, and also because, *inter alia*, the challenged practices of charging customers for overdraft fees or NSF fees are uniform for Plaintiffs and all Class Members. Accordingly, in pursuing their own self-interest in litigating their claims, Plaintiffs will also serve the interests of the other Class Members.

99. **Adequacy** – Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Plaintiffs and their counsel intend to prosecute this action vigorously.

100. **Predominance and Superiority** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of

this matter. Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiffs and Class Members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiffs and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

101.   Plaintiffs do not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiffs have demonstrated above that their claims are typical of the other Class Members and that they will adequately represent the Class. This particular forum is a desirable forum for this litigation because, among other reasons, Defendant resides in this district. Plaintiffs do not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

102.   Plaintiffs anticipate the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiffs anticipate the use of additional media and/or mailings.

103. This matter is properly maintained as a class action in that:

    a. Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

        1. Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

        2. Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

    b. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

104. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

105. Plaintiffs and each of the Class Members entered into an Account Agreement with Defendant covering the subject of overdraft and NSF transactions. This contract was drafted by and is binding upon Defendant.

106. Nowhere did the Account Agreement or Opt-In Contract state that PATELCO would hold sufficient funds upon authorization for a transaction and not allow it to be used for anything else, but then charge an overdraft fee at the time of the posting of the same transaction

when there had been enough money to cover it when funds were placed on hold. Further, nowhere did the Account Agreement or Fee Schedule at issue state that PATELCO would assess an additional NSF fee every time the same electronic item was re-presented for processing or submitted as a "retry." Also, nowhere did the Account Agreement or Fee Schedule at issue state that PATELCO would assess an overdraft fee following an NSF fee on the same item when the same item was re-presented for processing or submitted as a "retry." PATELCO wrongfully treated a "retry" as a new and separate "item" in violation of the terms of the Account Agreement. This also contradicted its own Fee Schedules prior to the one dated March 2019. Further, in the contracts Additionally, the operative contracts governed which fees could be charged and under which circumstances, and PATELCO breached these contracts by charging fees under circumstances not permitted by the contracts, or fees not authorized or disclosed by the contracts.

107. Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

108. Defendant breached the express and implied terms of the Account Agreement and Opt-In Contract and Fee Schedules effective prior to May 2020 by, *inter alia*, charging overdraft fees when a transaction had been authorized on a positive balance and the money sequestered for that transaction, and assessing multiple fees for the same electronic item.

109. As a proximate result of Defendant's breaches, Plaintiffs and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

**SECOND CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

110. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

111. Plaintiffs and each of the Class Members entered into contracts with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account

Agreement contract which covers overdraft fees and NSF fees, as well as the Fee Schedule. The contracts were drafted by and are binding upon Defendant.

112.    In the contracts, PATELCO promised that it would only assess a "fee" (singular) when it determined a member did not have enough money in his or her account to cover an "item," not "multiple fee**s**" for the same "item." In the Fee Schedule it stated the NSF fee or overdraft fee would be for each item, not "per each presentment of an item."  Nowhere in its contracts did Defendant state that it could charge more than one NSF or overdraft fee for a single item.  Further, it did not state it would hold funds for a transaction and thereby reduce the "available balance" by the amount of sequestered funds, yet potentially charge an overdraft fee at the time of the positing of the transaction despite already having set those funds aside. Nowhere did it state it would charge fees at all for certain fees it charged.

113.    Good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

114.    The material terms of the contracts therefore included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiffs and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' and the Class Members' rights and benefits under the contracts.

115.    Plaintiffs and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

AMENDED CLASS ACTION COMPLAINT

116.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple overdraft and NSF fees for the same electronic item.    Defendant could easily have avoided acting in this manner by simply changing the programing in its software to charge only an NSF "per item" as its own Fee Schedule stated it would do.    Defendant equally easily could have avoided charging both an overdraft fee following an NSF fee for the same item, and instead charged only an overdraft fee or an NSF fee, as its Account Agreement stated, by simply changing the programing in its software to  charge only one fee or the other for the "item," rather than both fees for the same item.    PATELCO acted in breach of the covenant of good faith and fair dealing when electing to charge an NSF fee followed by a later overdraft fee for the same item, because if it instead had first charged an overdraft fee rather than an NSF fee, the item could not have been re-presented to generate a second fee, since it already would have been paid.    PATELCO also acted in bad faith when after sequestering funds for a particular transaction and not making them available for any other use, nonetheless at the time of posting charging an overdraft fee on that same transaction for which funds already had been set aside. Defendant unilaterally elected to and did program its software to create accounting gimmicks such as this which would maximize its overdraft and NSF fees.    In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class Members of the full benefit of the contracts.

117.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION
**(Unjust Enrichment/Restitution)**

118.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

119.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

120.     Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees and repeat NSF and other fees assessed by Defendant, Plaintiffs and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiffs and the Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Money Had and Received)

121.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

122.     Defendant has obtained money from Plaintiffs and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

123.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiffs and the Class Members, and thus, this money should be refunded to Plaintiffs and the Class Members.  Therefore, Plaintiffs and the Class Members seek relief as set forth in the Prayer below.

## FIFTH CAUSE OF ACTION
### (Violation of Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.*)

124.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

125.     PATELCO's conduct described herein violates California's Unfair Competition Law (the "UCL"), codified as Business and Professions Code section 17200, et seq.  The UCL prohibits and provides civil remedies for unlawful and unfair competition.  Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.  In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.  By defining unfair competition to include "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws

to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

126.    The UCL expressly provides for injunctive relief, and also contains provisions denoting its public purpose.  A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general.  Although the private litigant controls the litigation of an unfair competition claim, the private litigant is not entitled to recover compensatory damages for her own benefit, but only disgorgement of profits made by the defendant through unfair or deceptive practices in violation of the statutory scheme or restitution to victims of the unfair competition.

127.    As further alleged herein, PATELCO's conduct violates the UCL's "unfair" prong insofar as PATELCO charges multiple NSF fees on a single item, charges overdraft fees when there was enough money in the account to cover a transaction, and charged fees that were not listed in either the Account Agreement or Fee Schedule, and also charged fees on transactions for which it previously already had sequestered aside money to cover and made unavailable for other purposes.  PATELCO's conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of PATELCO's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiffs and Class Members arising from PATELCO's unfair practices relating to the imposition of the improper fees outweighs the utility, if any, of those practices.

128.    PATELCO's unfair business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiffs and Class Members, and the general public.  PATELCO's conduct was substantially injurious to consumers in that they have been forced to pay improper, abusive, and/or unconscionable NSF, overdraft, and other non-contracted fees.

129.    As a result of PATELCO's violations of the UCL, Plaintiffs and Class Members have paid, and/or will pay improper NSF, overdraft, and other non-contracted fees in the future and thereby have suffered actual loss of money and may similarly suffer in the future if the misrepresentations allowed to continue. Absent injunctive relief forcing PATELCO to disgorge

itself of its ill-gotten gains and public injunctive relief prohibiting PATELCO from misrepresenting and omitting material information concerning its NSF and overdraft fee policy and other fees policy at issue in this action in the future, Plaintiff and other existing accountholders, and the general public, will suffer from and be exposed to PATELCO's conduct violative of the UCL.

## **PRAYER**

WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

1.  For an order certifying this action as a class action;

2.  For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.  For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.  For statutory damages;

5.  For an order enjoining the wrongful conduct alleged herein;

6.  For costs;

7.  For pre-judgment and post-judgment interest as provided by law;

8.  For attorneys' fees under the common fund doctrine, and all other applicable law and sources; and,

9.  For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class Members demand a trial by jury on all issues so triable.

Dated: July 28, 2020                          Respectfully submitted,

                                              KALIEL PLLC

                              By:    ___/S/ *Jeffrey Kaliel*_____
                                     Jeffrey D. Kaliel, CA Bar No. 238293
                                     Sophia G. Gold, CA Bar No.  307971

AMENDED CLASS ACTION COMPLAINT

THE KICK LAW FIRM, APC

Taras Kick, CA Bar No. 143379
Jeff Bils, CA Bar No. 301629

Attorneys for Plaintiffs Roxanne Wicks,
Claudine Saldivar, Barbara Bustamante, and
the Putative Class

AMENDED CLASS ACTION COMPLAINT